**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**BILLY JOE AYERS, ET AL**               **CIVIL ACTION NO. 2:18-CV-00186**

**VERSUS**                               **JUDGE JAMES D. CAIN, JR.**

**PACKAGING CORP. OF AMERICA,**          **MAGISTRATE JUDGE KATHLEEN KAY**
**INC., ET AL**

## MEMORANDUM IN SUPPORT OF PACKAGING CORPORATION OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Billy Ayers filed this negligence suit against Packaging Corporation of America ("PCA") individually and on behalf of his minor child Armondo Edward Ayers seeking recovery for claimed damages resulting from injuries allegedly sustained as a result of an explosion at PCA's DeRidder, Louisiana Mill ("Mill" or "DeRidder Mill") on February 8, 2017 ("DeRidder Incident"). At the time of the DeRidder Incident, Plaintiff was working as an employee of PCA's contractor, Elite Specialty Welding, LLC ("Elite"). Ayers is barred from bringing the claims presented as PCA was his statutory employer at the time of the DeRidder Incident. Consequently, the exclusive remedy provision of the Louisiana Workers Compensation Act ("LWCA") bars such claims.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

RELEVANT FACTUAL BACKGROUND.............................................................................1

LAW AND ARGUMENT....................................................................................................6

I.     Legal Standards.......................................................................................................6

     A.     Summary Judgment Standard ..............................................................6

     B.     The Exclusive Remedy Provisions of the Louisiana Workers'
              Compensation Act...............................................................................8

II.    Plaintiff's Claims against PCA are Precluded by the Exclusivity Provisions of the
     LWCA.........................................................................................................10

     A.     PCA is the Statutory Employer of Elite's Employees ...........................10

     B.     Elite's Work on the CCL was an Integral Part of, and Essential to, the
              Ability of PCA to Generate Goods, Products, and Services..................11

     C.     Plaintiff has not Sufficiently Alleged any "Intentional Act." ................15

CONCLUSION.................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ......................................................... 6

*Armond v. Marathon Oil Corp.*,
   2007 U.S. Dist. LEXIS 21383 (E.D. La. 3/22/07) ................................................................. 12

*Bazley v. Tortorich*,
   397 So.2d 475 (La. 1981) ...................................................................................................... 16

*Berthelot v. Murphy Oil, Inc.*,
   No. 09-4460, 2010 U.S. Dist. LEXIS 1140 (E.D. La. 1/7/10) ............................................... 14

*Blakely v. CITGO Petroleum Corp.*,
   737 F. Supp. 2d 599 (W.D. La. 2010) .................................................................................... 13

*Boudreaux v. Freeport Chemical Company*,
   576 So.2d 615 (La.App. 4 Cir. 1991) .................................................................................... 13

*Brumfield v. Hollins*,
   551 F.3d 322 (5th Cir. 2008) .................................................................................................. 6

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .................................................... 6, 7

*Condrey v. Sun Trust Bank of Georgia*,
   431 F.3d 191 (5th Cir. 2005) ................................................................................................... 7

*Cortez v. Hooker Chemical and Plastics Corp.*,
   402 So.2d 249 (La.App. 4 Cir. 1981) .................................................................................... 17

*Dark v. Georgia-Pacific Corp.*,
   176 Fed. Appx. 569 (5th Cir. 2006) ....................................................................................... 15

*Davis v. Southern Louisiana Insulations*,
   539 So.2d 922 (La.App. 4 Cir. 1989) .................................................................................... 17

*Donahue v. Republic Nat'l Distrib. Co., LLC*,
   No. 16-13948, 2018 U.S. Dist. LEXIS 148080 (E.D. La. 8/30/18) ......................................... 7

*Dycus v. Martin Marietta Corp.*,
   568 So.2d 592 (La.App. 4 Cir. 1990), *writ denied*, 571 So.2d 649 (La. 1990) ...................... 17

*Erwin v. Excello Corp.*,
   387 So.2d 1288 (La.App. 1 Cir. 1980), *writs denied*, 396 So.2d 1242 and 397 So.2d
   1363 (La. 1981) ...................................................................................................................... 17

*Guillory v. Domtar Indus., Inc.*,
   95 F.3d 1320 (5th Cir. 1996) ................................................................................................. 15

*Hodges v. The Mosaic Co.*,
   No. 05-5201, 2007 U.S. Dist. LEXIS 49065, 2007 WL 2008503 (E.D. La. 7/6/07) ............... 14

*Holliday v. B.E. & K. Constr. Co.*,
   563 So.2d 1333 (La.App. 3 Cir. 1990) ................................................................................. 17

*Hood v. South Louisiana Medical Center*,
   517 So.2d 469 (La.App. 1 Cir. 1987) .................................................................................... 17

*Jacobsen v. Southeast Distributors, Inc.*,
   413 So.2d 995 (La.App. 4 Cir. 1982), *writ denied*, 415 So.2d 953 (La. 1982) ...................... 17

*Johnson v. Tenn. Gas. Pipeline Co.*,
   99 F. Supp. 2d 755 (E.D. La. 2000) ...................................................................................... 14

*Jones v. Motiva Enterprises, LLC.*,
   2002WL1919818 at *2 (E.D. La. 2002) ............................................................. 13
*Joseph v. Shell Chem. Co.*,
   2009 U.S. Dist. LEXIS 53128, 2009 WL 1789422 (E.D. La. 6/23/09)................................. 12
*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ........................................................................... 7
*Lujan v. Nat. Wildlife Federation*,
   497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ...................................... 7
*Minter v. Great American Insurance Co. of New York*,
   423 F.3d 460 (5th Cir. 2005) .......................................................................... 6
*Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*,
   520 F.3d 409 (5th Cir. 2008) ...................................................................... 6, 8
*Oliver v. Day & Zimmermann*,
   No. 05-3072, 2006 U.S. Dist. LEXIS 6647, 2006 WL 508047 (E.D. La. 2/22/06)................. 14
*Rogers v. La. Dept. of Corrections*,
   43,000 (La.App. 2 Cir. 4/30/08), So. 2d 252 ................................................... 15
*Salmon v. Exxon Corporation*,
   824 F. Supp. 81 (W.D. La. 1993)................................................................... 13
*Schaefer v. Royal Prod. Co.*,
   No. 6:11-cv-00808, 2012 U.S. Dist. LEXIS 55361 (W.D. La. 4/19/12) ........................... 13
*Snow v. Gulf States Utilities Co.*,
   492 So.2d 31 (La.App. 1 Cir. 1986), *writ denied*, 496 So.2d 349 (La. 1986) ............... 17
*Taylor v. Metropolitan Erection Co.*,
   496 So.2d 1184 (La.App. 5 Cir. 1986), *writ denied*, 497 So.2d 1388 (La. 1986) ............ 17
*Washburn v. Harvey*,
   504 F.3d 505 (5th Cir. 2007) .......................................................................... 6
*White v. Monsanto Co.*,
   585 So.2d 1205 (La. 1991) ........................................................................... 16
*Williams v. Gervais F. Favrot Co., Inc.*,
   573 So.2d 533 (La.App. 4 Cir. 1991), *writ denied*, 576 So.2d 49 (La. 1991) ............... 17
*Wright v. Excel Paralubes*,
   807 F.3d 730 (5th Cir 2015) ........................................................................... 9

**Statutory Authorities**
La. C.C. art. 2045. ....................................................................................... 10
La. C.C. art. 2046. ....................................................................................... 10
La. R.S. 23:1031 .......................................................................................... 8
La. R.S. 23:1032 ..................................................................................... 8, 15
La. R.S. 23:1061. ..................................................................................... 9, 13

**Rules and Regulations**
Fed. R. Civ. P. 56(a) ..................................................................................... 6

**Exhibits**
Exhibit A, Declaration of Lori Smith ............................................. 1, 2, 3, 4, 10, 12
Exhibit B, Declaration of Bruce Kummerfeldt ................................................... 1
Exhibit C, Declaration of Stacy Miller ..........................................................11

## RELEVANT FACTUAL BACKGROUND

In October 2013, PCA acquired Boise Inc. and its subsidiaries, which included Boise Packaging and Newsprint, L.L.C. ("Boise"), a wholly owned subsidiary of Boise Inc., through a stock purchase.[1] The purchase resulted in PCA becoming the sole stockholder of Boise Inc. and obtaining control of Boise Inc. and its assets, including the Mill.[2] In the months leading up to the DeRidder Incident, day to day operations of the Mill were conducted at the direction of PCA management and carried out by PCA's employees with the assistance of Boise payroll employees. Boise was completely merged into PCA in June 2017.[3]

On the day of the DeRidder Incident, PCA was conducting its Annual Maintenance Shutdown ("Annual Shutdown"). Several Elite employees[4] were making repairs to the Mill's Clean Condensate Line ("CCL"). Generally, the CCL is part of the Mill's piping system which allows PCA to collect evaporated condensate and reuse it for the Mill's processes. One purpose of the CCL is to facilitate cleaning and filling of the Mill's Foul Condensate Tank ("FCT"). Elite's workers were working on the portion of the CCL above the FCT when it exploded. Billy Ayers and other Elite employees were performing other turnaround maintenance and repairs related to the shutdown when the tank exploded.

---

[1] Exhibit B, Declaration of Bruce Kummerfeldt, ¶ 3.

[2] Exhibit B, Declaration of Bruce Kummerfeldt, ¶ 3.

[3] Exhibit B, Declaration of Bruce Kummerfeldt, ¶¶ 4, 7, 10.

[4] Sedrick Stallworth – *Stallworth, et al. v. Packaging Corp. of America  Inc., et al.* Western District of Louisiana, 2:18-cv-00440-JDC-KK; Jody Gooch - *Gooch v. Packaging Corp. of America Inc., et al.* Western District of Louisiana, 2:18-cv-00278; William Rolls, Jr. – *Rolls v. Packaging Corp. of America Inc., et al.*, Western District of Louisiana, 2:18-cv-00188; Guadalupe Delarosa – *Delarosa v. Packaging Corp. of America Inc., et al.*, Western District of Louisiana, 2:18-cv-00186.

As a general matter when a maintenance or repair issue is identified at the Mill, a planner assigned to the area is notified.[5] After receiving notice of a maintenance or repair issue, the planner reviews the requested work and prepares a work order if needed, and may request bids from contractors to determine the anticipated cost of the work.[6] Once anticipated costs are determined, the planner prepares a purchase requisition which is submitted for approval.[7] If the purchase requisition is approved and includes work to be performed by a contractor, PCA then issues a Purchase Order ("PO") to the chosen contractor.[8]

The Annual Outage allows PCA to perform needed repairs and maintenance work. During the outage, which typically lasts one week, maintenance and repair operations are conducted 24-hours a day.[9]

PCA also customarily schedules other work outages to conduct maintenance and repair operations as needed.[10] One such work outage was scheduled in November 2016,[11] during which work was scheduled to repair a leak in the Mill's CCL which had been discovered by Mill personnel. As a result of this discovery, work order #1573059 ("Work Order") was prepared to "repair [a] leak in line at the Clean Condensate Tank in pulp Mill."[12] A bid for the repair work was obtained from Elite, and PCA in due course issued a PO to Elite for repair of the CCL: PO # 215857 ("Elite Purchase Order").

---

[5] Exhibit A, Declaration of Lori Smith, ¶ 3.

[6] Exhibit A, Declaration of Lori Smith, ¶ 4.

[7] Exhibit A, Declaration of Lori Smith, ¶¶ 4-5.

[8] Exhibit A, Declaration of Lori Smith, ¶ 4.

[9] Exhibit A, Declaration of Lori Smith, ¶ 13.

[10] Exhibit A, Declaration of Lori Smith, ¶ 14.

[11] Exhibit A, Declaration of Lori Smith, ¶ 15.

[12] Exhibit A, Declaration of Lori Smith, ¶¶ 6-8.

The Elite Purchase Order specifically referenced the CCL repairs first identified in the Work Order ("1573059-clean condensate tank, brk"), along with other work arising from four other work orders.[13] The face of the Elite Purchase Order explicitly identified PCA/Boise as principal and statutory employer of Elite's employees under the LWCA, stating:

> THE LOUISIANA LEGISLATURE PASSED LEGISLATION ON JUNE 5, 1997, ACT 315, WHICH REQUIRES CONTRACTS TO RECITE IN WRITING THE "STATUTORY EMPLOYER" STATUS OF THE PARTIES HERETO. THE GOVERNOR SIGNED THE LEGISLATION ON JUNE 17, 1997, AND IT BECAME EFFECTIVE ON THAT DATE (THE "ACT"). PCA/BOISE (AS PRINCIPAL EMPLOYER UNDER THE ACT) AND THE CONTRACTOR [ELITE] (AS DIRECT EMPLOYER) MUTUALLY AGREE THAT **IT IS THEIR INTENTION TO RECOGNIZE PCA/BOISE AS THE STATUTORY EMPLOYER OF THE CONTRACTOR'S [ELITE'S] EMPLOYEES UNDER THE ACT** WHILE CONTRACTOR'S [ELITE'S] EMPLOYEES ARE PROVIDING WORK AND/OR SERVICES TO PCA/BOISE UNDER THIS AGREEMENT. THE PARTIES AGREE THAT PCA/BOISE IS A STATUTORY EMPLOYER FOR PURPOSES OF THE ABOVE-REFERENCED ACT.[14] (Emphasis added).

The Elite Purchase Order also states, **"This P.O. is issued subject to PCA's Terms and Conditions  http://www.packagingcorp.com/doing-business-with-pca."** (Emphasis added). The Terms and Conditions applied to Elite's performance of the PO and also explicitly state PCA is recognized as statutory employer of Elite's employees for work conducted pursuant to the Elite Purchase Order:

> The Louisiana Legislature passed legislation on June 5, 1997, Act 315, which requires contracts to recite in writing the "statutory employer" status of the parties hereto. The Governor signed the legislation on June 17, 1997, and it became effective on that date (the "Act"). **PCA (as principal employer under the Act) and the Seller [Elite] (as direct employer) mutually agree that it is their**

---

[13] Exhibit A, Declaration of Lori Smith, ¶ 9, Ex. A-2, p. 1 of 2.

[14] Exhibit A, Declaration of Lori Smith, ¶ 9, Ex. A-2.

**intention to recognize PCA as the statutory employer of the Seller's [Elite's] employees under the Act** while Seller's [Elite's] employees are providing work and/or services to PCA under this Agreement. The parties agree that PCA is a statutory employer only for purposes of the above-referenced Act.[15]

(Emphasis added). The Terms and Conditions further specified that "'PCA' and 'Seller' shall be deemed to include each party's respective subsidiaries and affiliates," thus also including PCA's wholly owned subsidiary, Boise, as statutory employer in addition to PCA.[16]

While Elite performed much of the work under the Elite Purchase Order in November 2016, Elite did not perform the permanent repairs on the CCL. Instead, PCA made temporary repairs to the CCL and rescheduled Elite's permanent repairs to be completed during the February 2017 Annual Shutdown. It was this work for which  PCA issued an updated purchase order to Elite to complete the work detailed in Work Order #1573059 – the permanent CCL repair (the "Updated Elite Purchase Order") – the same repairs detailed in Work Order #1573059. The Updated Elite Purchase Order again explicitly referenced Work Order #1573059 and described the work Elite was scheduled to complete: "repair piping to the Clean Condensate tank in the Pulp Mill."[17]

The permanent repair of the CCL, however, was not the only work for Elite at the 2017 Annual Shutdown.  Elite was issued PO numbers: 216360, 216365, 216366, 216685, 216732, 216733, 216865, 216866, 217370, 217877, 217878, 218704.[18] As with the Elite Purchase Order, the Updated Elite Purchase Order, and all other purchase orders issued by PCA to Elite for work during the February 2017 Annual Shutdown, each stated: **"This P.O. is issued subject to PCA's**

---

[15] Exhibit A, Declaration of Lori Smith, ¶ 11, Ex. A-3.

[16] Exhibit A, Declaration of Lori Smith, ¶ 11, Ex. A-3.

[17] Exhibit A, Declaration of Lori Smith, ¶¶ 11-12, Ex. A-4.

[18] Exhibit A, Declaration of Lori Smith, ¶ 16, Exhibit A-5.

Terms    and    Conditions    **http://www.packagingcorp.com/doing-business-with-pca."**
(Emphasis added)[19] PCA's Terms and Conditions contain enforceable statutory employer
language and apply to not just PCA but all its subsidiaries, including Boise.[20]

As with the Updated Purchase Agreement, each purchase order PCA issued to Elite for
the 2017 Annual Shutdown stated "THIS PURCHASE ORDER IS GOVERNED BY A
MASTER SERVICE AGREEMENT FOR CONSTRUCTION DATED 8/18/14 CURRENTLY
IN EFFECT BETWEEN THE PURCHASE ORDER VENDOR AND PACKAGING
CORPORATION OF AMERICA." The reference to August 18, 2014, points to a contract
originally entered into between Boise and Elite; this earlier contract also contains statutory
employer language covering work being done at the DeRidder Mill by Elite. The identification
of this older contract as one "between purchase order vendor and Packaging Corporation of
America" recognizes the progressive efforts of the entity to transition from Boise to PCA and the
Parties' understanding that statutory employer protection was afforded to PCA/Boise. As noted,
the actual merger was finalized in June 2017. Thus, the Updated Elite Purchase Order as well as
every other PO issued to Elite, repeated PCA and Elite's mutual intention and recognition that
PCA and its subsidiaries and affiliates, including Boise, were designated as statutory employer of
Elite's employees.

---

[19] Exhibit A, Declaration of Lori Smith, ¶ 16, Exhibit A-5.

[20] Exhibit A, Declaration of Lori Smith, ¶ 12, Ex. A-4.

## LAW AND ARGUMENT

**I.    Legal Standards**

    **A.    Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable substantive law in the case.[21] A genuine issue of material fact exists if a reasonable jury could render a verdict for the non-moving party.[22]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact.[23] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[24] All facts and justifiable inferences are construed in the light most favorable to the non-movant.[25] However, if the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the non-moving party's claim.[26] The motion

---

[21] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Minter v. Great American Ins. Co. of New York,* 423 F.3d 460, 465 (5th Cir. 2005).

[22] *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008), citing *Anderson,* 477 U.S. at 252.

[23] *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007), citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

[24] *Id.*

[25] *Brumfield,* 551 F.3d at 326; *Anderson,* 477 U.S. at 255.

[26] *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 412 (5th Cir. 2008), citing *Celotex Corp.,* 477 U.S. at 325.

should be granted if the non-moving party cannot produce evidence to support an essential element of its claim.[27] Where no such showing is made, the moving party "is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[28]

The Fifth Circuit has further elaborated:

> This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. . . . [S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.[29]

Accordingly, when a summary judgment movant will not have the burden of proof on a claim at trial, he can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the non-movant's claim.[30] Once that is done, the non-movant must go beyond his pleadings and designate specific facts demonstrating that there is a genuine issue for trial.[31] Notably, "The determination of statutory employer status is a question of law for the court to decide."[32]

---

[27] *Condrey v. Sun Trust Bank of Georgia*, 431 F.3d 191, 197 (5th Cir. 2005).

[28] *Lujan v. Nat. Wildlife Federation*, 497 U.S. 871, 884, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) (quoting *Celotex Corp.,* 477 U.S. at 322-23).

[29] *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations and internal quotation marks omitted).

[30] See *Celotex Corp*., 477 U.S. at 325.

[31] See *Celotex Corp*., 477 U.S. at 324; *Little*, 37 F.3d at 1075.

[32] *Donahue v. Republic Nat'l Distrib. Co., LLC*, No. 16-13948, 2018 U.S. Dist. LEXIS 148080, at *6 (E.D. La. Aug. 30, 2018) citing *Louque v. Scott Equip. Co., LLC*, 16-507 (La.App. 5 Cir. 2/8/17), 212 (footnote continued)

## B.     The Exclusive Remedy Provisions of the Louisiana Workers'
##        Compensation Act

The Louisiana Workers' Compensation Act grants employees the guarantee of compensation for "personal injury by accident arising out of and in the course of his employment...."[33] – regardless of fault – but, in exchange, gives up those employees' potential tort claims against their employers. "The Act was a compromise between labor and industry pursuant to which laborers received guaranteed no-fault recovery and industry was relieved of the possibility of large damage awards in the tort system."[34] Louisiana Revised Statute 23:1032(A)(1)(a) provides:

> Except for intentional acts . . . , the rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation . . . shall be exclusive of all other rights, remedies, and claims for damages....

The exclusivity of LWCA remedies extends beyond an employee's direct employer, to include all claims against an "employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal under any dual capacity theory or doctrine."[35] Specifically, the LWCA establishes a principal's solidary liability with the direct employer for a worker's LWCA compensation benefits and, concomitantly, grants the principal the same exclusive remedy protections based on a principal's status as "statutory employer":

---

So.3d 1203, 1209; *St. Angelo v. United Scaffolding, Inc.,* 09-1420 (La. App. 4 Cir. 5/19/10), 40 So.3d 365, 369; *see also Whitehead v. Int'l Paper Co.,* No. 16-00176, 2018 U.S. Dist. LEXIS 200901, at *3 (W.D. La. 11/ 26/18).

[33] La. R.S. 23:1031(A).

[34] *O'Regan v. Preferred Enters., Inc.,* 98-1602 (La. 3/17/00), 758 So.2d 124, 136.

[35] *O'Regan,* 758 So.2d at 136; La. R.S. 23:1032(A)(1)(b): A "principal" is "any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof." *Id*; La. R.S. 23:1032(A)(2).

...when any "principal" as defined in R.S. 23:1032(A)(2), undertakes to execute any work, which is a part of his trade, business, or occupation and contracts with any person, in this Section referred to as the "contractor", for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal, as a statutory employer, **shall be granted the exclusive remedy protections of R.S. 23:1032 and shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter** which he would have been liable to pay if the employee had been immediately employed by him; ....[36]

The LWCA provides two methods by which a principal is recognized as a statutory employer.[37] "First, the principal may contract to perform work and then subcontract all or a portion of that work to another (the 'two contract theory')."[38] "Second, the principal may enter a written contract 'recognizing' it as the statutory employer of the other party's employees."[39] In the second circumstance—the applicable provision here—a contract recognizing a statutory employer relationship creates "a rebuttable presumption" of such a relationship that "may be overcome only by showing that the work is not an integral part of or essential to the ability of the principal to generate that individual principal's goods, products, or services."[40] The U.S. Fifth Circuit Court of Appeal has recognized that Louisiana courts have found that the statutory amendments in 1997 were intended to recognize a more liberal standard in favor of finding a statutory employer relationship."[41]

---

[36] La. R.S. 23:1061(A)(1) (emphasis added).

[37] *Wright v. Excel Paralubes*, 807 F.3d 730, 732 (5th Cir 2015); La. R.S. 23:1061.

[38] *Wright,* 807 F.3d 730, 732-33; La. R.S. 23:1061(A)(2).

[39] *Wright,* 807 F.3d at 733; La. R.S. 23:1061(A)(3).

[40] La. R. S. 23:1061(A)(3); for purposes of Section 1061, "work shall be considered part of the principal's trade, business, or occupation if it is an integral part of or essential to the ability of the principal to generate that individual principal's goods, products, or services."

[41] *Wright*, 807 F.3d at 733 (citations omitted).

## II.   Plaintiff's Claims against PCA are Precluded by the Exclusivity Provisions of the LWCA

### A.   PCA is the Statutory Employer of Elite's Employees

The LWCA is Plaintiff's presumed, exclusive remedy against PCA because PCA was the statutory employer of Elite's employees at the time of the DeRidder Incident. Notably, Elite's work on the CCL identified in the Elite Purchase Order was the very work being performed above the FCT which exploded.

The Elite Purchase Order and each of PCA's purchase orders to Elite for the February 2017 Annual Shutdown identifies PCA/Boise as the statutory employer of Elite's employees. Each such purchase order incorporates PCA's Terms and Conditions, which also identify PCA and Boise as statutory employer, and which also reference the earlier agreement between Elite and Boise.[42] Incorporation of both the Terms and Conditions and the earlier agreement confirm that PCA and Boise were statutory employers of Elite's employees for work done during the 2017 Annual Shutdown. Both PCA's Terms and Conditions and the earlier agreement expressed clear and enforceable statutory employer language.

As the Louisiana Civil Code establishes, the "interpretation of a contract is the determination of the common intent of the parties,"[43] which is a question of law.[44] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[45]

---

[42] Exhibit A, Declaration of Lori Smith, ¶¶ 11, 16, Exhibit A-3, Exhibit A-5.

[43] La. C.C. art. 2045.

[44] *Iteld v. Four Corners Const., L.P.,* 2012-1504 (La. App. 4 Cir. 6/5/13), 157 So.3d 702, 714.

[45] La. C.C. art. 2046.

On the face of each purchase order PCA issued to Elite for the 2017 Annual Shutdown, and in the same place on each purchase order, PCA's Terms and Conditions were incorporated by reference and hyperlink.[46] Again, PCA's Terms and Conditions repeat and confirm the parties recognize "PCA (as principal employer under the Act) and the Seller [Elite] (as direct employer) mutually agree that it is their intention to recognize PCA as the statutory employer of the Seller's [Elite's] employees under the Act while Seller's [Elite's] employees are providing work and/or services to PCA under this Agreement."[47] Additionally, the Terms and Conditions explicitly state that references to Seller (Elite) or PCA are to include their subsidiaries and affiliates, which for PCA includes Boise.[48] Thus, as explicitly stated on the face of the Elite Purchase Order, and reiterated by reference to and adoption of PCA's Terms and Conditions on the purchase orders, PCA has clearly established PCA/Boise was statutory employer of Elite's employee Billy Ayers.

### B.     Elite's Work on the CCL was an Integral Part of, and Essential to, the Ability of PCA to Generate Goods, Products, and Services

As the Declaration of Stacy Miller, Technical Manager, reveals, the PCA Mill manufactures containerboard.[49] A necessary part of the manufacturing process is the "pulping process" which converts the wood into wood pulp which is then used to make containerboard.[50] A by-product of this process is the discharge of foul condensate. The Mill recycles this for reuse by separating out the clean condensate and reusing it in the manufacturing process. The CCL is

---

[46] Exhibit A, Declaration of Lori Smith, ¶¶ 9, 16 Ex. A-2, Ex A-5.

[47] Exhibit A, Declaration of Lori Smith, ¶ 9, Ex. A-3.

[48] Exhibit A, Declaration of Lori Smith, ¶ 9, Ex. A-3.

[49] Exhibit C, Declaration of Stacy Miller, ¶ 2.

[50] Exhibit C, Declaration of Stacy Miller, ¶ 3.

the line used to transport the clean condensate for use in the Mill's operations, making the manufacture more efficient and environmentally friendly as fresh water use is minimized.

But the CCL repair was not Elite's only work at the Annual Shutdown.[51] Elite's other work, along with all other maintenance and repairs performed at the Annual Shutdown, were necessary for PCA to produce containerboard at the Mill and were integral to the Mill's processes running smoothly and efficiently.

As PCA/Boise is presumed to have been Billy Ayers' statutory employer at the time of the DeRidder Incident,[52] Billy Ayers bears the burden of showing otherwise. To make such a showing (i.e., to rebut the presumption) he must show the work contracted to Elite during the 2017 Annual Shutdown was not "an integral part" or an "essential part" of PCA's ability to generate goods, products, or services at the Deridder Mill.

Under the facts of this case, however, Louisiana law forecloses the possibility of such a rebuttal. In Louisiana, it is well settled that work related to turnarounds is recognized as a "normal part of a plant's operations" essential to the continued, safe, and efficient operations of the plant.[53]  The statutory employer presumption favoring PCA/Boise is powerful. And where

---

[51] Elite was contracted to provide labor and supervision to repair cladding on a Fourdrineier (PO# 218704), replace a 12" valve on the #2 Blow Tank Discharge Pressure (PO# 216360), replace a 36" valve on Blow Heat Evaporation Accumulator Pressure (PO# 216365), replace a 18" valve on the BHE 1st Effect Evaporation Hot Condensation Flow (PO# 216366), provide mechanical support to reroute the Hot Water Tank overflow to the Blow Heat sewer (PO# 216685), install tie ends and valves to transfer Liquor from the Big Line to the Little line and bypass the Big Line Knot Tank (PO# 216732), roll out and replace selected mud lines and caustic valves for inspection and hydroblasting in the Lime Kiln (PO# 216733), install a new nozzle with repad on a filtrate tank and install a valve and blind flange on the new nozzle (PO# 216865), repair the bottom of the Lime Mud Storage Tank Agitator (PO# 216866), inspect the green liquor clarifier for damage and weld crackage (PO# 217877), replace nozzles in a clarifier (PO# 217878).

[52] La R.S. 23:1061(A)(3)

[53] *King v. Debusk Servs. Grp.*, 2017-1577 (La.App. 1 Cir. 09/04/19); 2019 La. App. Unpub. LEXIS 251; See also: *Joseph v. Shell Chem. Co.*, 2009 U.S. Dist. LEXIS 53128, 6-7, 2009 WL 1789422 (E.D. La. June 23, 2009); *Armond v. Marathon Oil Corp.,* 2007 U.S. Dist. LEXIS 21383 (E.D. La. Mar. (footnote continued)

Elite's work for PCA directly relates to PCA's ability to operate the DeRidder Mill, work bearing an attenuated relationship to the putative employer's business has defeated attempts to rebut it. For example, in *Whitehead v. International Paper Company,*[54] the Federal District Court for the Western District of Louisiana determined the repair of a leak in a water line of a fire prevention system located in a virtually abandoned building on the premises of a paper mill was nevertheless "integral" or "essential" to the mill's ability to generate goods, products and/or services.

The plaintiff was injured climbing stairs in the abandoned building, and the court found the mill was the plaintiff's presumed statutory employer.

The plaintiff tried to rebut the presumption by arguing the fire prevention system in the virtually abandoned building had nothing to do with the mill's ability to generate its goods, products, and services. The plaintiff concluded by arguing a water line in an unused a building could not be "integral" or "essential" to the mill's ability to generate paper goods. In deposition, the mill operator acknowledged the building was essentially abandoned and not used for "any known purpose."

The court noted the Louisiana legislature intended the terms "integral" and "essential" in La. R.S. 23:1061(A)(3) to be liberally and expansively construed.[55] The Western District,

---

22, 2007); *Boudreaux v. Freeport Chemical Company*, 576 So.2d 615, 621 (La.App. 4 Cir. 1991); *Jones v. Motiva Enterprises*, LLC., 2002WL1919818 at *2 (E.D. La. 2002); *Salmon v. Exxon Corporation*, 824 F. Supp. 81, 86- 87 (W.D. La. 1993).

[54] *Whitehead v. Int'l Paper Co.,* 2018 U.S. Dist. LEXIS 200901 (W.D. La. 11/27/18).

[55] The words "integral" and "essential" are expansively construed. Several courts have held even work outside an employer's core operations may still be essential or integral to its operations. *See, Everett v. Rubicon, Inc., .,* 04-1988 (La.App. 1 Cir. 6/14/06), 938 So.2d 1032, 1040 (breaking up concrete support pedestals surrounding a receiver that was used to collect waste chemicals was essential to a chemical manufacturer); *Schaefer v. Royal Prod. Co.,* No. 6:11-cv-00808, 2012 U.S. Dist. LEXIS 55361, at *12 (W.D. La. Apr. 19, 2012) (saltwater removal is an integral part of and essential to production of oil and gas); *Blakely v. CITGO Petroleum Corp.,* 737 F. Supp. 2d 599, 606 (W.D. La. 2010) (construction and (footnote continued)

applying this liberal and expansive construction, rejected the *Whitehead* plaintiff's argument outright, and in doing so, held:

> this building houses an important fire prevention aspect of IP's operation, if nothing else. It does not challenge the imagination to see how such a component would play an essential or integral part in the daily operation of a paper mill, particularly as it relates to the issues of safety and code compliance. [56]

Put differently, the court determined repairs to a fire-sprinkler-system water-line in an empty building having no known purpose on the premises of a paper mill was nevertheless "essential" or "integral" to the paper mill's ability to generate goods, products and services.

The facts of this case lead to the same conclusion. All maintenance and repairs performed at the 2017 Annual Shutdown were necessary for PCA to operate the Mill and produce containerboard, including those contracted to Elite.[57] The direct relationship between the annual maintenance and repairs and the mill's operations disposes of any argument Elite's work during the 2017 Annual Shutdown was in some way not "integral" or "necessary" to PCA's ability to generate goods, products or services. Sound logic precludes any determination to the contrary.

If the fire prevention and code compliance detailed in *Whitehead* were "integral" or "essential" to that paper mill's "ability to generate goods, products and/or services," then the

---

environmental clean-up services are an essential part of operating a refinery); *Berthelot v. Murphy Oil, Inc.,* No. 09-4460, 2010 U.S. Dist. LEXIS 1140, at *22 (E.D. La. Jan. 7, 2010) (electric repairs to a transformer was essential to an oil refinery); *Johnson v. Tenn. Gas. Pipeline Co.,* 99 F. Supp. 2d 755, 758 (E.D. La. 2000) (catering services are essential to an oil and gas compressor facility); *Oliver v. Day & Zimmermann,* Civ. A. No. 05-3072, 2006 U.S. Dist. LEXIS 6647, 2006 WL 508047, at *2 (E.D. La. Feb. 22, 2006) (security services are essential to an oil refinery's operations); *Hodges v. The Mosaic Co.,* Civ. A. No. 05-5201, 2007 U.S. Dist. LEXIS 49065, 2007 WL 2008503, at *3 (E.D. La. July 6, 2007) (installation of electrician scaffolding is essential to a chemical manufacturer's operations).

[56] *See Whitehead v. Int'l Paper Co.,* 2018 U.S. Dist. LEXIS 200901 (W.D. La. 11/27/18) (Court finding under the expansive meaning attributed to these terms by Louisiana federal and state courts, such a result would be error.).

[57] Exhibit C, Declaration of Stacy Miller, ¶¶ 3, 6-8, Exhibit C-1; Exhibit A, Declaration of Lori Smith, ¶¶ 11, 16, Exhibit A-3, Exhibit A-5.

annual maintenance and repairs being conducted by Elite, to include the CCL which work was being done at the time of the explosion, must necessarily be "integral" or "essential" to this containerboard mill's ability to produce "goods, products and/or services."

This sound logic leads the Court to the only plausible outcome: PCA was Billy Ayers' presumed statutory employer at the time of the explosion, and under Louisiana law, Billy Ayers cannot rebut the presumption. Consequently, PCA/Boise was the statutory employer of Billy Ayers at the time of the explosion.

**C.    Plaintiff has not Sufficiently Alleged any "Intentional Act."**

Under Louisiana law, workers' compensation is an employee's exclusive remedy against his employer, statutory employer or fellow employees for work-related injury, unless his injury is proximately caused by the employer's intentional tortious act.[58] Louisiana courts, as well as federal courts sitting in diversity, have repeatedly and consistently stated the intentional act exception is to be narrowly interpreted,[59] and thus, the standard for prevailing on a claim of intentional tort under Louisiana law is extremely high.[60]

Courts interpreting this narrow exception require a showing that not only was the act intentional, but the act *and the harm* were certain to occur. To avoid the exclusive remedy provisions of the LWCA, a plaintiff must show the person acting and causing injury must (1)

---

[58] *Reeves v. Structural Pres. Sys*., 98-1785 (La. 03/12/99) 731 So.2d 208, 210; La. R.S. 23:1032(B).

[59] See, e.g., *Reeves*, 731 So.2d at 211-12 (citations omitted); *Cole v. State, Dep't of Public Safety & Corrections*, 01-2123 (La. 9/4/02), 825 So.2d 1134, 1140-41; *Snow v. Lenox Int'l*, 27,533 (La.App. 2 Cir. 11/1/95), 662 So.2d 818, 820; *Rogers v. La. Dept. of Corrections*, 43,000 (La.App. 2 Cir. 4/30/08), 982 *So. 2d 252*, 259, *writ denied*, 992 So. 2d 931 (La. 9/19/08); *Bridges v. Carl E. Woodward, Inc*., 663 So.2d 458 (La.App. 4 Cir. 10/12/1995), *writ denied*, 666 So. 2d 674 (La. 1/26/96); *Guillory v. Domtar Indus., Inc*., 95 F.3d 1320 (5th Cir. 1996); *Dark v. Georgia-Pacific Corp*., 176 Fed. Appx. 569 (5th Cir. 2006).

[60] *Bonner v. Ga.-Pacific, LLC*, 2013 U.S. Dist. LEXIS 80514, at *7 (M.D. La. 6/6/13) (quoting *Wilson v. Kirby Corporation*, 2012 U.S. Dist. LEXIS 60544 (E.D. La. 5/1/12).

"consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct" or (2) "know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result."[61] "[O]nly where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow has an act been characterized as intentional."[62] In effect, this determination hinges on proof the actor intentionally desired the full extent of harm occasioned (or believed his actions would bring about the full extent of the harm occasioned). With that in mind, it's no wonder there are so few cases in which the intentional act exception is met.

Despite this rigorous standard requiring proof the actor was certain he would bring about the harm occasioned or desired to bring about the harm occasioned, plaintiffs still commonly include unsupported, conclusory, and gratuitous allegations of such certainty or intent in efforts to plead around LWCA exclusivity. Billy Ayers attempts to do so here.

Billy Ayers broadly alleges PCA knew, was substantially certain, or "in the exercise of even the most basic care had to know or be substantially certain" that "incomplete or improper evacuation, purging, flushing, or blocking" of the FCT would cause the explosion and would occur and Billy Ayers to "suffer severe and significant injuries."[63] These allegations attempt to mask what are simply allegations of ordinary negligence by repeating language from the statute—by using legal "buzz words." But no amount of artful pleading or legal "buzz words" can change the basic nature of Billy Ayers' claims—ordinary negligence. The use of phrases like

---

[61] *Bazley v. Tortorich*, 397 So.2d 475, 481 (La. 1981); see also *White v. Monsanto Co.*, 585 So.2d 1205, 1208 (La. 1991); *Reeves*, 731 So.2d at 211.

[62] *White*, 585 So.2d at 1208.

[63] R. Doc. 1-7, Page 7 of 8, Pet. ¶ 22.

"incomplete and improper evacuation. . . ." in and of themselves contradicts any suggestion of intentional injury.

As a matter of law, claims of ordinary negligence, even if surrounded by statutory "buzz words," cannot overcome the LWCA's exclusivity provisions. And it is precisely those types of claims—that is, claims by employees alleging ordinary negligence against employers for employment-related injuries—the LWCA was enacted to preclude. The intentional act exception is narrowly construed to effectuate the Louisiana legislature's intent. The Louisiana legislature intended the LWCA to protect employers from employees' tort claims arising out of work-related accidents. It did not intend for the LWCA to be easily bypassed by allegations like those of Billy Ayers, allegations that - even if proven -, amount to nothing more than ordinary negligence.[64] Consequently, there are no genuine issues of material fact, and Billy Ayers' unsupported and conclusory allegations fail as a matter of law.

---

[64] "Louisiana courts narrowly construe the intentional act exception and have almost universally held employers and co-employees are not liable under the intentional act exception for violations of safety standards or for failing to provide safety equipment." *Reeves v. Structural Preservation Systems*, 98-1795 (La. 3/12/99), 731 So.2d 208, 211-12, *citing*, *Jasmin v. HNV Central Riverfront Corp.*, 94-1497 (La.App. 4 Cir. 8/30/94), 642 So.2d 311, *writ denied*, 647 So.2d 1110 (La. 1994) (failure to provide safe working environment in grain storage bin); *Leger v. Hardy Rice Drier, Inc.*, 93-1512(La.App. 3 Cir. 6/1/94), 640 So.2d 650 (maintaining forklift in unsafe condition); *Williams v. Gervais F. Favrot Co., Inc.*, 573 So.2d 533 (La.App. 4 Cir. 1991), *writ denied*, 576 So.2d 49 (La. 1991) (violations of OSHA and other accepted industry safety standards); *Dycus v. Martin Marietta Corp.*, 568 So.2d 592 (La.App. 4 Cir. 1990), *writ denied*, 571 So.2d 649 (La. 1990) (allowing worker to operate dangerous equipment); Holliday v. B.E. & K. Constr. Co., 563 So.2d 1333 (La.App. 3 Cir. 1990) (knowledge that machine is dangerous and that its use creates a high probability that someone will eventually be injured from that use); *Davis v. Southern Louisiana Insulations*, 539 So.2d 922 (La.App. 4 Cir. 1989) (failure to provide ladders and scaffolding); *Hood v. South Louisiana Medical Center*, 517 So.2d 469 (La.App. 1 Cir. 1987) (failure to maintain safe working conditions); *Taylor v. Metropolitan Erection Co.*, 496 So.2d 1184 (La.App. 5 Cir. 1986), *writ denied*, 497 So.2d 1388 (La. 1986) (failure to provide scaffold worker with safety belt); *Snow v. Gulf States Utilities Co.*, 492 So.2d 31 (La.App. 1 Cir. 1986), *writ denied*, 496 So.2d 349 (La. 1986) (allowing worker to work too closely to energized wires); *Jacobsen v. Southeast Distributors, Inc.*, 413 So.2d 995 (La.App. 4 Cir. 1982), *writ denied*, 415 So.2d 953 (La. 1982) (failure to provide specifically requested safety equipment); *Cortez v. Hooker Chemical and Plastics Corp.*, 402 So.2d 249 (La.App. 4 Cir. 1981) (deficiently designed machinery and disregard of OSHA standards); *Erwin v. Excello Corp.*, 387 So.2d 1288 (La.App. 1 Cir. 1980), *writs denied*, 396 So.2d 1242 and 397 So.2d 1363 (La. 1981).

## CONCLUSION

PCA was Billy Ayers' statutory employer at the time of the DeRidder Incident. Plaintiff's unsupported and wholly conclusory allegations attempting to plead around the LWCA's high bar against tort claims fail on their face. As a consequence, the LWCA provides the exclusive benefits for himself and his beneficiaries, and PCA respectfully requests this Court grant its motion for summary judgment and dismiss Plaintiff's claims against PCA in their entirety, with prejudice.

Respectfully submitted,

BY:  ___/s/ Jeffrey A. Riggs_____
      JENNIFER E. MICHEL (#18114)
      JEFFREY A. RIGGS (#17770)
      MICHAEL L. BARRAS (#30855)
      LEWIS BRISBOIS BISGAARD & SMITH LLP
      100 East Vermilion Street, Suite 300
      Lafayette, Louisiana 70501
      Telephone: 337-326-5777
      Facsimile: 337-504-3341
      *Counsel for Defendant, Packaging Corporation of America*

## CERTIFICATE OF SERVICE

I certify that on September 30, 2019, I electronically filed *Defendant Packaging Corporation of America's Motion for Summary Judgment with* the Clerk of Court using the CM/ECF system, which will automatically send notice of this filing to all counsel of record.

      _/s/ Jeffrey A. Riggs _____
      JEFFREY A. RIGGS